1 | SCOTT + SCOTT LLP
Arthur L. Shingler III (181719)
2 | 600 B Street, Suite 1500
San Diego, CA  92101
3 | Tel.: 619/233-4565
Fax: 619/233-0508
4 | Email: ashingler@scott-scott.com

5 | SCOTT + SCOTT LLP
David R. Scott
6 | 108 Norwich Avenue
P. O Box 192
7 | Colchester, CT  06415
Tel:  860/537-5537
8 | Fax: 860/537-4432
Email: drscott@scott-scott.com

9 |

*Counsel for Plaintiff*

10 |

**FILED**

FEB - 6 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

SC

11 |         UNITED STATES DISTRICT COURT

12 |        NORTHERN DISTRICT OF CALIFORNIA

13 |

CELESTE BRACKLEY, On Behalf of Herself
14 | and All Others Similarly Situated,

15 |                    Plaintiffs,

16 |          vs.

17 | BANK OF AMERICA, N.A., BANK OF
AMERICA CORP., CAPITAL ONE
18 | FINANCIAL CORP., CHASE BANK USA,
N.A., JP MORGAN CHASE & CO.,
19 | CITIBANK N.A., CITIGROUP, INC.,
WASHINGTON MUTUAL, INC., HSBC
20 | NORTH AMERICA HOLDINGS, INC.,
HSBC FINANCE CORP. and WELLS
21 | FARGO & COMPANY,

22 |                   Defendants.

Case No. **C 07 0772**

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
NATIONAL BANK ACT, THE SHERMAN
ACT, §17200, *ET SEQ.* OF THE CAL. BUS.
& PROF. CODE, THE CALIFORNIA
CONSUMERS LEGAL REMEDIES ACT,
THE CARTWRIGHT ACT AND FOR
BREACH OF COVENANT AND UNJUST
ENRICHMENT

DEMAND FOR JURY TRIAL

23 |
24 |
25 |
26 |
27 |
28 |

1        Plaintiff, on behalf of herself and all others similarly situated, by and through her

2   undersigned attorneys, allege, upon knowledge as to their own acts and otherwise upon information

3   and belief, as follows:

4                                    **INTRODUCTION**

5        1.       This action is brought on behalf of credit cardholders who have paid excessive late

6   fees and/or over-limit fees ("Penalty Fees"). Defendants, the largest U.S. credit card issuers

7   ("issuing banks" or "issuers"), impose Penalty Fees of up to $39 when cardholders breach their

8   agreement to make payments by a certain date or to make charges only within defined credit limits.

9   The imposition of these excessive Penalty Fees violates the National Bank Act's ("NBA")

10  prohibition against overcharging consumers. In addition, defendants have conspired to fix prices and

11  maintain a price floor for late fees in violation of §1 of the Sherman Act.

12       2.       When cardholders breach their contracts with defendants by paying late or exceeding

13  their credit limits, defendants suffer *de minimis* actual damages. Thus, defendants' imposition of up

14  to $39 in late fees and up to $39 in over-limit fees vastly exceeds any actual damages that issuers

15  incur and are punitive damages for contractual breaches. Under common law, punitive damages for

16  contractual breaches are not enforceable. Any damages specified within liquidated damages clauses

17  must represent a reasonable approximation of actual damages.

18       3.       To circumvent this bedrock principle of contracts law, in the mid 1990s, defendants

19  and other credit card issuers successfully lobbied for the enactment of a statutory and regulatory

20  regime that, when read without reference to recently clarified due process limitations, purports to

21  allow them to impose unlimited punitive damages for breaches of credit card contracts. In 1995, the

22  Comptroller of the Currency issued a regulation interpreting the NBA to authorize credit card issuers

23  to impose whatever Penalty Fees are allowed by their home states. Defendants made sure to locate

24  their credit card operations in those states that purport to allow unlimited Penalty Fees and then

25  "exported" those punitive damages nationwide.

26       4.       Recent Supreme Court precedent, however, establishes that the Due Process Clause

27  sets strict limits on the size of punitive damages relative to actual damages. In 2003, the Supreme

28  Court held that punitive damages cannot exceed more than nine times actual compensatory damages

COMPLAINT

1   and generally should not exceed four times actual damages.  Under principles of constitutional

2   avoidance, the NBA, its regulations, and the state statutes that collectively authorize the Penalty Fees

3   must be interpreted to pass constitutional muster.  That is, the NBA must be interpreted so as to

4   comply with substantive due process principles and therefore cannot authorize Penalty Fees that

5   exceed actual damages by more than a single digit multiplier.

6       5.      Defendant banks charge Penalty Fees of up to $39 even though their damages

7   incurred for a late payment or for exceeding a prescribed credit limit are *de minimis* and are more

8   than recovered through interest charges on outstanding balances and other fees.  As a result,

9   defendants' Penalty Fees exceed the amounts that any state or federal statute and/or regulation may

10  constitutionally allow and are unenforceable punitive damages.  As such, these Penalty Fees violate

11  the NBA's prohibition against overcharging customers, when the NBA is interpreted to comport

12  with substantive due process limits.  The Penalty Fees also violate California consumer protection

13  statutes, including the Unfair Competition Law ("UCL") and the Consumers Legal Remedies Act

14  ("CLRA").  The imposition and collection of Penalty Fees also constitute unjust enrichment and a

15  breach of the covenant of good faith and fair dealing in the contracts between defendants and credit

16  cardholders.

17      6.      Moreover, the defendant banks do not compete over late fees, although they purport

18  to be fierce competitors in the credit card market.  The defendant credit card issuers, who dominate

19  the credit card market and exercise market power, enjoying a combined 70% share of the credit card

20  market, have colluded to restrain competition over the terms and fix the prices of late fees through,

21  *inter alia*, adopting, maintaining and monitoring a pricing schedule in violation of §1 of the Sherman

22  Act and California's Cartwright Act.  As a result of their collusive activities, defendants have

23  steadily ratcheted up the price of late fees.

24      7.      As a result of defendants' illegal, collusive and anticompetitive conduct, Penalty Fees

25  have skyrocketed over the last decade.  The size of the penalty for making a late payment rose from

26  an approximate average of $13 in 1995 to $34 in January 2006.  The Government Accountability

27  Office ("GAO") reported that in 2005 the top six U.S. credit card issuers assessed late fees on 35%

28

COMPLAINT

1  of their active U.S. accounts, and assessed over-limit fees on 13% of their active U.S. accounts. Late

2  fees alone comprised about 70% of the card industry's $17.1 billion in fees from penalties in 2006.

3      8.      Finally, in an attempt to avoid liability, each of these large issuers has included

4  arbitration clauses in their cardholder agreements which are form contracts of adhesion imposed by

5  parties possessing far superior bargaining power and resources.  The arbitration clauses are

6  procedurally and substantively unconscionable. Each purportedly bans class actions in an attempt to

7  shield defendants from actions such as this one which are the only practical means available to

8  cardholders to vindicate important statutory rights and obtain relief from defendants' illegal conduct.

9  In addition, most of the defendants' arbitration clauses have so called "appellate" provisions that

10  would allow defendants to try the case "anew" before a panel of arbitrators if plaintiff prevails in

11  arbitration.  The cost and attendant delay of having to arbitrate a complex class arbitration twice is

12  prohibitive.  For these and other reasons the arbitration clauses are unenforceable.  Given the

13  combined market share controlled by defendants, cardholders are effectively precluded from

14  obtaining a credit card the terms of which do not include illegal and unconscionable Penalty Fees

15  and arbitration clauses.

16                          **JURISDICTION AND VENUE**

17      9.      Jurisdiction is conferred upon this Court pursuant to 15 U.S.C. §§15 and 26 (Clayton

18  Act), 12 U.S.C. §§85 and 86 (National Bank Act), and 28 U.S.C. §§1331, 1337 and 1367.

19      10.     This Court also has diversity jurisdiction over the classes defined herein pursuant to

20  28 U.S.C. §1332(d)(2) and (6) (Class Action Fairness Act of 2005) because one or more members of

21  the classes defined herein are citizens of a State different from one or more defendants and the

22  aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and

23  costs.

24      11.     Venue is proper in this district pursuant to §§4, 12 and 16 of the Clayton Act, 15

25  U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391, because defendants transact business in this district,

26  and because thousands of class members are located in this district.  Additionally, a substantial part

27  of the interstate trade and commerce involved and affected by the alleged violations of the antitrust

28

COMPLAINT

- 3 -

1  laws was and is carried on in part within this district. The acts complained of have had, and will

2  have, substantial anticompetitive effects in this district.

3  **THE PARTIES**

4  **Plaintiff**

5      12.    Plaintiff Celeste Brackley is a resident of the State of California, County of San

6  Diego. Plaintiff has used a credit card issued by one or more of the defendants. As a result of

7  defendants' unlawful conduct alleged herein, plaintiff has paid at least one excessive and illegal

8  Penalty Fee in the four years preceding the filing of this Complaint.

9      13.    The existence, imposition and price of late fees and over-limit fees is material to

10  plaintiff and all class members.

11  **The Bank of America Defendants**

12      14.    Defendant Bank of America, N.A. is a national banking association with its principal

13  place of business in Charlotte, North Carolina. Bank of America, N.A. is an issuing bank that,

14  throughout this judicial district, issues credit cards to individuals and businesses. Bank of America,

15  N.A. is a wholly owned subsidiary of N.B. Holdings, which in turn is a wholly owned by defendant

16  Bank of America Corporation, a Delaware corporation with its principal place of business in

17  Charlotte, North Carolina. In January 2006, Bank of America Corporation acquired 100% of the

18  stock of MBNA America Bank, N.A. ("MBNA"). It knowingly imposed late fees and over-limit

19  fees as high as $39 and had actual knowledge of, and has knowingly participated in, the conspiracies

20  alleged in this Complaint.

21      15.    Defendant Bank of America, N.A., defendant Bank of America Corporation, N.B.

22  Holdings and MBNA are referred to collectively as "Bank of America." Ranked by outstandings,

23  Bank of America is the largest issuer of Visa and MasterCard branded credit cards in the United

24  States.

25  **The Capital One Defendants**

26      16.    Capital One Bank, a Virginia bank with its principal place of business in Glen Allen,

27  Virginia, and Capital One F.S.B., a national bank with its principal place of business in McLean,

28  Virginia, are wholly-owned subsidiaries of defendant Capital One Financial Corporation, a Delaware

COMPLAINT

1   corporation with its principal place of business in McLean, Virginia.  Defendant Capital One

2   Financial Corporation and Capital One Bank and Capital One F.S.B. are collectively referred to as

3   "Capital One."

4         17.    Capital One is an issuing bank that, throughout this judicial district, issues credit

5   cards to individuals and businesses.  It knowingly imposed late fees as high as $39 and over-limit

6   fees as high as $29 and had actual knowledge of, and has knowingly participated in, the conspiracies

7   alleged in this Complaint.  Ranked by outstandings, Capital One is the fourth largest issuer of Visa

8   and MasterCard branded credit cards in the United States.

9   **The Chase Defendants**

10         18.    Defendant Chase Bank USA, N.A., a New York bank with its principal place of

11   business in New York, New York, is the successor to Chase Manhattan Bank USA, N.A., and a

12   wholly-owned subsidiary of defendant JPMorgan Chase & Co., a Delaware corporation with its

13   principal place of business in New York, New York.  In 2004, JP Morgan Chase & Co. completed its

14   acquisition of Bank One Corporation and Bank One, Delaware, N.A.  Defendants Chase Bank USA,

15   N.A. and JP Morgan Chase & Co., and Chase Manhattan Bank USA, N.A., Bank One Corporation,

16   and Bank One, Delaware, N.A. are referred to collectively herein as "Chase."

17         19.    Chase is an issuing bank that issues credit cards to individuals and businesses

18   throughout this judicial district.  It knowingly imposed late fees and over-limit fees as high as $39

19   and had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this

20   Complaint.  Ranked by outstandings, defendant Chase is the second largest issuer of Visa and

21   MasterCard branded credit cards in the United States.

22   **The Citigroup Defendants**

23         20.    Defendant Citibank N.A., a bank with its principal place of business in New York,

24   New York, is a subsidiary of defendant Citigroup, Inc., a Delaware corporation with its principal

25   place of business in New York, New York.  Citicorp merged into defendant Citigroup, Inc., on

26   August 1, 2005.  Defendant Citibank N.A., Citicorp, and defendant Citigroup, Inc. are collectively

27   referred to herein as "Citigroup."

28

COMPLAINT

1      21.     Citigroup is an issuing bank that, throughout this judicial district, issues credit cards

2  to individuals and businesses. It knowingly imposed late fees and over-limit fees as high as $39 and

3  had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this

4  Complaint. Ranked by outstandings, Citigroup is the third largest issuer of Visa and MasterCard

5  branded cards in the United States.

6  **The Washington Mutual Defendants**

7      22.     Defendant Washington Mutual, Inc. is a Washington corporation with its principal

8  place of business in Seattle, Washington. In October 2005, Washington Mutual, Inc. completed its

9  acquisition of Providian. Defendant Washington Mutual, Inc. and Providian are collectively referred

10  to as "Washington Mutual."

11      23.     Washington Mutual is an issuing bank that, throughout this judicial district, issues

12  credit cards to individuals and businesses. It knowingly imposed late fees as high as $39 and over-

13  limit fees as high as $35 and had actual knowledge of, and has knowingly participated in, the

14  conspiracies alleged in this Complaint. Ranked by outstandings, Washington Mutual is the sixth

15  largest issuer of Visa and MasterCard branded credit cards in the United States.

16  **The HSBC Defendants**

17      24.     Defendant HSBC North America Holdings, Inc. ("HSBC North America") is a

18  holding company incorporated under Delaware law, with its principal place of business in Prospect

19  Heights, Illinois. HSBC North America is a holding company subsidiary of HSBC Holdings plc

20  ("HSBC Holdings"), which is a public limited company incorporated in England and Wales. HSBC

21  North America is the holding company for all of HSBC's United States and Canadian businesses.

22      25.     HSBC Bank USA, N.A. is a national banking association organized under the laws of

23  the United States with its principal place of business located in Wilmington, Delaware. Defendant

24  HSBC Finance Corporation is a Delaware corporation with its principal place of business in Prospect

25  Heights, Illinois. HSBC Card Services includes the GM card, HSBC Bank Nevada, N.A., HSBC

26  Bank U.S.A., N.A., HSBC Finance and Orchard Bank

27      26.     Defendants HSBC North America and HSBC Finance Corporation (and its

28  predecessor Household International, Inc.) and HSBC Holdings, HSBC Bank USA, N.A. and the

COMPLAINT

1   HSBC Card Services subdivision of HSBC North America and all their predecessors, affiliates and

2   subsidiaries are collectively referred to as "HSBC." HSBC is an issuing bank that, throughout this

3   judicial district, issues credit cards to individuals and businesses. HSBC knowingly imposed late

4   fees as high as $39 and over-limit fees as high as $35 and had knowledge of and has knowingly

5   participated in the conspiracies alleged in the Complaint. Ranked by outstandings, HSBC was the

6   fifth largest issuer of Visa and MasterCard branded credit cards in the United States in 2006.

7   **The Wells Fargo Defendants**

8        27.    Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with

9   its principal place of business in San Francisco, California. Wells Fargo & Company is an issuing

10  bank that, throughout this judicial district, issues credit cards through its wholly owned subsidiaries

11  Wells Fargo Bank, N.A., Wells Fargo Financial Bank and Wells Fargo Financial National Bank to

12  individuals and businesses. Defendants Wells Fargo & Company, Wells Fargo Bank, N.A., Wells

13  Fargo Financial Bank and Wells Fargo Financial National Bank are collectively referred to as "Wells

14  Fargo." Wells Fargo knowingly imposed late fees and over-limit fees as high as $35 and had actual

15  knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

16  Ranked by outstandings, Wells Fargo is the seventh largest issuer of Visa and MasterCard branded

17  credit cards in the United States.

18        28.    Defendants Bank of America, Capital One, Chase, Citigroup, Washington Mutual,

19  HSBC and Wells Fargo are referred to here collectively as "defendants."

20                              **CO-CONSPIRATORS**

21        29.    Various other persons, firms, corporations, organizations, and other business entities,

22  some unknown and others known, not joined as defendants in this Complaint or identified as co-

23  conspirators herein, have also participated as co-conspirators in the violations alleged and have

24  performed acts and made statements in furtherance thereof. Co-conspirators include, but are not

25  limited to, the following: financial institutions that issue credit cards, payment industry media, third-

26  party processors such as First Data Resources ("FDR") and Total Systems Services, Inc. ("TSYS")

27  that process payment card transactions, credit card industry consultants, trade associations such as

28

COMPLAINT

1 │ the American Bankers Association, and the two major credit card networks, Visa U.S.A. ("Visa")

2 │ and MasterCard International, Inc. ("MasterCard").

3 │     30.     At all times herein mentioned, each and every defendant and co-conspirator was an

4 │ agent of each and every other defendant and co-conspirator. Each of the defendants aided and

5 │ abetted the commission of unlawful, unfair and deceptive business practices by their co-defendants

6 │ or co-conspirators. Defendants and co-conspirators were aware, or should have been aware, that the

7 │ imposition of excessive Penalty Fees was unlawful, unfair and deceptive as alleged herein. By

8 │ facilitating the imposition, terms and pricing of Penalty Fees, defendants and their co-conspirators

9 │ substantially assisted and/or encouraged their co-defendants and co-conspirators in the commission

10 │ of the unlawful, unfair and deceptive practices alleged herein.

11 │ **CLASS ACTION ALLEGATIONS**

12 │     31.     Plaintiff brings this action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules

13 │ of Civil Procedure. Plaintiff seeks to represent the following classes:

14 │     32.     ***Nationwide Injunctive Relief Class***: All holders of credit cards (excluding federal,

15 │ state and local governmental entities, defendants, their directors, officers and members of their

16 │ families) issued by defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington

17 │ Mutual and Wells Fargo.

18 │     33.     ***Nationwide Damages Classes***

19 │     (a)     ***Nationwide Late Fee Damages Class***: All holders of credit cards issued by

20 │ defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual and Wells

21 │ Fargo (excluding federal, state and local governmental entities, defendants, their directors, officers

22 │ and members of their families) who have been charged a late fee from January 31, 2003 through the

23 │ trial of this matter (the "Class Period").

24 │     (b)     ***Nationwide Over-Limit Fee Damages Class***: All holders of credit cards

25 │ issued by defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual

26 │ and Wells Fargo (excluding federal, state and local governmental entities, defendants, their directors,

27 │ officers and members of their families) who have been charged an over-limit fee during the Class

28 │ Period.

COMPLAINT

1      34.   *California Classes*

2           (a)   *California Late Fees Class*: All holders of credit cards in California issued by

3    defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual and Wells

4    Fargo (excluding federal, state and local governmental entities, defendants, their directors, officers

5    and members of their families) who have been charged a late fee during the Class Period.

6           (b)   *California Over-Limit Fee Class*: All holders of credit cards in California

7    issued by defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual

8    and Wells Fargo (excluding federal, state and local governmental entities, defendants, their directors,

9    officers and members of their families) who have been charged an over-limit fee during the Class

10   Period.

11      35.   The members of the classes are so numerous and geographically dispersed that

12   joinder of all class members in this action is impracticable.

13      36.   Plaintiff's claims are typical of the claims of the members of the classes, because

14   plaintiff and all members of the classes were damaged by the same wrongful conduct of the

15   defendants, and will continue to be so damaged and/or are threatened with such damage in the

16   absence of injunctive relief, and defendants have acted on grounds generally applicable to the

17   classes.

18      37.   Plaintiff will fairly and adequately protect the interests of the classes. The interests of

19   plaintiff are coincident with, and not antagonistic to, those of the classes.  In addition, plaintiff is

20   represented by counsel who are experienced and competent in the prosecution of complex class

21   action antitrust and consumer litigation, including complex class actions involving credit card

22   corporations and financial institutions.

23      38.   Questions of law and fact are common to the members of the classes and the

24   defendants and their co-conspirators have acted on grounds generally applicable to all members of

25   the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief

26   with respect to the classes as a whole.  Among the questions of law and fact common to the classes

27   are:

28

COMPLAINT

1          (a)     Whether late fees imposed by defendants constitute penalties and/or punitive

2     damages for breach of contract;

3          (b)     Whether over-limit fees imposed by defendants constitute penalties and/or

4     punitive damages for breach of contract;

5          (c)     Whether the various federal and state statutes and regulations that purportedly

6     authorize the imposition of Penalty Fees as contractual punitive damages must be interpreted to

7     comply with substantive due process requirements;

8          (d)     Whether the Penalty Fees defendants imposed during the Class Period exceed

9     the levels allowed by the statutes and regulations as constitutionally interpreted;

10          (e)     Whether if those relevant statutes and regulations are not susceptible to an

11    interpretation that is consistent with due process requirements, they must be invalidated as

12    unconstitutional and the common law ban on punitive damages must be reinstated;

13          (f)     Whether defendants charged members of the classes late fees that constituted

14    unlawful, deceptive and/or unfair punitive damages for breach of contract in violation of statutes and

15    common law including the NBA, the UCL and the CLRA;

16          (g)     Whether defendants charged members of the classes over-limit fees that

17    constituted unlawful, deceptive and/or unfair punitive damages for breach of contract in violation of

18    statutes and common law including the NBA, the UCL and the CLRA;

19          (h)     Whether the defendants and their co-conspirators engaged in a contract,

20    combination, or conspiracy to restrain competition over the terms and pricing of late fees;

21          (i)     The duration and extent of the contract, combination or conspiracy;

22          (j)     The mechanisms used to accomplish the contract, combination or conspiracy;

23          (k)     Whether the defendants and their co-conspirators violated §1 of the Sherman

24    Act and the Cartwright Act;

25          (l)     Whether members of the classes are threatened with continuing harm from the

26    violations of federal and state statutes and common law as alleged herein; and

27          (m)     Whether defendants unjustly enriched themselves.

28

COMPLAINT

1    39.    The defendants have acted and continue to act on grounds generally applicable to the

2    classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with

3    respect to the classes as a whole.

4    40.    Class action treatment is superior to the alternatives, if any, for the fair and efficient

5    adjudication of the controversy.

6    41.    Plaintiff knows of no unusual difficulties that are likely to be encountered in the

7    management of this action that would preclude its maintenance as a class action.

8                          **BACKGROUND: THE CREDIT CARD MARKET**

9    42.    Credit cards, like Visa-branded and MasterCard-branded cards, are payment devices

10   that a consumer can use to make purchases through a revolving line of credit, the terms of which are

11   set by the card issuer.  Visa- and MasterCard-branded cards are issued by banks or their affiliates.

12   Consumers can make credit card purchases from unrelated merchants without accessing or reserving

13   the consumer's funds at the time of the purchase.

14   43.    Credit cards provide the cardholder the option of (i) paying all charges within a set

15   period after a monthly bill is presented, or (ii) paying only a portion of the charge within that time

16   and paying the remainder in monthly installments plus a finance or interest charge.

17   44.    Visa and MasterCard (the "networks") each own and operate open credit card

18   networks through which their respective member banks (*i.e.*, issuing banks or issuers) can issue

19   credit cards to cardholders under licensing agreements with Visa or MasterCard.  Among other

20   things, Visa and MasterCard: (i) implement systems and technologies to authorize, clear, and settle

21   credit card transactions; (ii) market and promote their brand names; (iii) develop and impose rules;

22   and (iv) assess fees on their member banks.  These activities are principally financed through fees

23   and assessments levied on their members, including defendants.

24   45.    In addition, merchants contract with Visa and MasterCard member banks ("acquiring

25   banks" or "acquirers") to accept their cards.  The cardholder accounts are owned by the issuing

26   banks and transactions are processed by the banks themselves, or by third-party processors such as

27   First Data Resources, Inc. ("FDR") or Total System Services, Inc. ("TSYS").  FDR and/or TSYS

28   provide processing services for each defendant.  The services processors provide are typically

COMPLAINT

1   receiving authorization and clearing data from Visa's and MasterCard's systems, housing cardholder

2   account information, generating and mailing monthly statements, calculating cardholder charges and

3   fees, producing and mailing plastic cards, providing customer services in the issuer's name to

4   cardholders, and providing reporting to the banks on their card portfolios.

5         46.    In a typical credit card transaction on the Visa or MasterCard networks, a merchant

6   accepts a credit card from a customer for the provision of goods and services. The merchant swipes

7   the card. The information is transmitted to the bank that issued the card for authorization. After the

8   issuing bank electronically authorizes the transaction, the merchant submits the Visa or MasterCard

9   card transaction to his acquiring bank. The acquirer remits the transaction to the network for

10  clearing and settlement and pays the merchant. Clearing is the movement of data that describes the

11  transaction from the acquirer to the issuer, and settlement is the movement of funds by the networks

12  between the issuer and the acquirer. The networks receive and route transactions to the issuers or

13  their designated processors. The networks then report the issuer and acquirer settlement positions,

14  and remit the amounts owed to the acquirers from the issuers. The issuers bill the cardholders. The

15  foregoing is generally accomplished electronically through the networks' clearing and processing

16  systems or those of a third-party processor.

17  **RELEVANT MARKET**

18        47.    The relevant market is the market for credit cards issued by U.S. financial institutions.

19  Credit cards are a separate market from other forms of payment, such as cash, checks and debit cards

20  for a variety of reasons, including that (i) credit cards are considered safer than carrying large

21  amounts of cash; (ii) credit cards are more widely accepted than checks; (iii) credit cards offer a

22  credit function that debit cards do not and thus forms of payment such as cash, checks and debit

23  cards are not a close substitute for a credit card.

24        48.    Credit cards occupy a unique position in today's economy in that they are a practical

25  necessity for most consumers to rent a car, reserve a hotel, buy airline tickets, engage in Internet

26  commerce and secure numerous other services and products. Many consumers view credit cards as

27  an indispensable part of every day life. Cardholders in the United States each have an average of

28  4.95 credit cards and there are approximately 464 million credit card accounts in the United States.

COMPLAINT

49.    Other forms of payment such as cash, checks and debit cards are not readily interchangeable with credit cards by virtue of the credit function that allows a cardholder to make purchases worth more than the balance they have in a deposit account and to delay payment for a specific period of time. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003). The trial court in that case ruled that "defendants' [Visa and MasterCard] own admissions and evidence of consumer preferences support . . . and demonstrate the existence of a general purpose card market separate from other forms of payment." The court also explained that "consumers strongly prefer to use credit and charge cards rather than cash or checks, because they generally do not want to carry large sums of cash to make large purchases, and checks generally have much lower merchant acceptance than either cash or general purpose cards. . . . Also, consumers benefit from the general purpose card's credit function, which allows for the choice to purchase now and pay later." *Id.* at 336. Accordingly, the court held that "because card consumers have very little sensitivity to price increases in the card market and because neither consumers nor the defendants view debit, cash and checks as reasonably interchangeable with credit cards, general purpose cards constitute a product market." *Id.* at 338. The Second Circuit upheld the trial court's ruling that credit cards constitute a separate and relevant market. *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003).

50.    The geographic market is the market for credit cards in the United States.

51.    Defendants' combined market share of the United States credit card market exceeds 70% as of 2006, and defendants collectively exercise market power.

## TRADE AND COMMERCE

52.    The activities of the defendants and their co-conspirators, as described in this Complaint, took place within interstate commerce, had and continue to have a substantial effect on interstate trade and commerce and have unreasonably restrained, and continue to restrain, interstate trade and commerce. The acts complained of in this Complaint have harmed the business and property of plaintiff and members of the classes and present a continued threat of loss and damage to plaintiff and the members of the classes.

COMPLAINT

1

## FACTUAL ALLEGATIONS

2    53.    Credit card contracts state that monthly payments must be made by the due date,

3    which are printed on the billing statement or for electronic payors displayed on the issuer's Web site.

4    These agreements also limit the amount of credit available to the cardholder.

5    54.    For the first few decades after credit cards were introduced in the 1950s, issuers

6    commonly charged a single fixed interest rate of around 20% as the annual percentage rate ("APR")

7    that covered most of an issuer's expenses associated with card use. By 1980, issuers also charged

8    cardholders an annual fee of $20 to $50. Generally, credit cards were only offered to the most

9    creditworthy U.S. consumers. In the late 1980s and early 1990s, few issuers charged Penalty Fees

10   for making late payments or exceeding the credit limit set by the issuer. When such Penalty Fees

11   were assessed, they were relatively small. For example, the typical late fee in the 1980s ranged from

12   just $5 to $10. This is not surprising because their costs from late payment or exceeding one's credit

13   limit are *de minimis* and it is generally unlawful to impose penalties or punitive damages for breach

14   of contract.

15   55.    In the period from 1990 through 2004 interest rates declined substantially. This

16   decline and competition over interest rates and annual fees resulted in lower credit card interest rates

17   and the elimination of annual fees. To offset the resultant decline in revenue, issuers made an "end

18   run" around the prohibition on contractual punitive damages in order to increase Penalty Fee

19   revenue. In 1995, the banking and payment card industry successfully lobbied the Comptroller of

20   the Currency to issue a regulation interpreting Section 85 of the NBA to permit nationally chartered

21   bank issuers to charge customers in any state whatever late and over-limit fees are permitted in the

22   bank's home state. *See* 12 U.S.C. §85 and 12 C.F.R. §7.4001. The banking and payment card

23   industry had previously lobbied certain state legislatures to allow issuers located in their states to

24   impose unlimited Penalty Fees. The 1995 regulation along with the laws of the banks' home states

25   appeared to allow issuers to impose unlimited punitive fees for late fees and over-limit fees.

26   **The Rise in Late Fees**

27   56.    After this regulation went into effect, issuers made sure to locate their credit card

28   operations in the states purportedly allowing unlimited Penalty Fees. The issuers then increased

COMPLAINT

1    their late fees and over-limit fees dramatically.  By 1998, cardholder fee income had grown by

2    nearly 160%, from $7.3 billion in 1994 to $18.9 billion in 1998.  Between 1994 and 1999, Penalty

3    Fees doubled in actual dollar averages.  Late fees were the driving force in the issuers' increased fee

4    income.  By mid-1999, more than 90% of the industry was charging late fees, and 85% of the

5    industry was charging over-limit fees.

6          57.     Between 1995 and 2000, late fees rose 104%. Between 2000 and 2006, late fees rose

7    another 27%. Defendants' late fees in this period were priced within $5 of each other. By 2005, late

8    fees had risen from an average of $11.71 in 1994 to $34.42 in 2006, an increase of over 193%.  Six

9    of the nation's top ten issuers charged up to a $39 late fee in 2006.

10         58.     In 2006, issuers earned roughly $79 billion from late fees and interest charges.  The

11   fees were likened to "a hidden tax on card holders" during the Senate Committee on Banking

12   hearing on the credit card industry on January 25, 2007.

13   **The Rise in Over-Limit Fees**

14         59.     Over-limit fees are imposed when consumers exceed the credit limit set forth in the

15   credit agreement.   In the mid 1990s, issuers typically assessed an over-limit fee only if the

16   cardholder exceeded the credit line by 5%-10%. And most issuers would only assess an over-limit

17   fee if the closing balance for the month was above the credit line. But by 2005, top issuers such as

18   defendants MBNA and Chase were charging fees for exceeding the credit limit at *any* time during

19   the billing cycle. Moreover, finance charges added to an account after the close of the current billing

20   cycle can cause an over-limit status, even if the minimum payment has already been posted.  Not

21   surprisingly, instances where defendant issuers are not charging over-limit fees are on portfolios

22   marketed to affluent cardholders with high credit limits and who can most afford to pay over-limit

23   fees. Because defendants have not charged over limit fees on certain portfolios, the percentage of

24   accounts subject to over-limit fees decreased slightly between 2003 and 2005, while the price of the

25   over-limit fee imposed on less affluent accounts has soared to outrageous levels.

26         60.     Since June 1993, over-limit fees have soared by over 150%.  In the five years

27   between 1994 and 1999, average over-limit fees grew 96%, from $12.75 to $24.96. Between 1998

28   and 2003, over-limit fees increased 52%, from an average of $18.59 to $28.21. Between 2001 and

COMPLAINT

2004, over-limit fees increased 17%.  By 2005, the most common over-limit fee among major issuers was up to $35, some issuers were already charging up to $39 on accounts with higher balances.

### THE CURRENT LEVEL OF PENALTY FEES IS UNLAWFUL

61.   Penalty Fees are a form of punitive damages imposed for breaches of the cardholders' contractual obligation to make payments by a certain date or stay within contractual credit limits.

62.   There is no legitimate business justification or cost basis for the level of over-limit fees or late fees defendants charge.  They are virtually pure profit for the defendants.  Purported cost justifications for Penalty Fees include the cost of funds for late payment, cardholder default and administration relating to collections.  However, each of these purported costs is captured through interest rates and finance charges imposed on the entire balance due, even though cardholders are late only on remitting a smaller, minimum payment.  Moreover, late payers tend to be charged higher interest rates, called "penalty rates," on their entire balances.  A penalty rate may exceed 30% and generate substantial additional revenues from late payments.

63.   Late fees therefore represent double dipping by the issuers, because cardholders already pay interest on balances not paid in full by the due date.  Issuers that jack up interest rates as punishment for late payment engage in *triple* dipping.  An over-limit fee resulting in part from assessed late fees and interest charges is the ***quadruple dip***.  To illustrate this quadruple dipping: for a $100 balance with 29% interest plus a $39 late fee, the real rate of interest is 68%.  Adding a $39 over-limit fee, and the real rate of interest jumps to over 107%.  Hit the cardholder with compound interest on the fee and with over-limit fees two or three months in a row, the interest rate could swell to over 350% or higher.

64.   Issuers conduct their business as though the NBA, its regulations, and state statutes give them discretion to impose unlimited punitive damages for breaches of credit card agreements.  In 2003, however, the United States Supreme Court held that the U.S. Constitution's Due Process Clause strictly limits punitive damages to no more than nine times actual damages.  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).  To the extent the NBA allows Penalty Fees for breaches of contract, the statute must be interpreted to comport with due process principles.

COMPLAINT

1    Defendants incur *de minimis* or no actual damages as a result of late payments or over limit charges.

2    Increased interest revenue on outstanding balances more than compensates defendants for any

3    damages suffered due to late payments or over-limit charges. Thus, under *State Farm*, the NBA and

4    state laws only allow defendants to impose contractual penalties of, at most, nine times their actual

5    damages. Yet, they knowingly impose late fees and over-limit fees of up to $39. The late fees and

6    over-limit fees they impose vastly exceed what the NBA allows when interpreted to comply with

7    substantive due process limits. These overcharges also violate California's UCL and CLRA and

8    permit defendants to unjustly enrich themselves. Thus, defendants' Penalty Fees constitute illegal

9    overcharging of consumers in violation of the NBA.

10   **The Conspiracy to Fix and Maintain Disproportionately High Late Fees**

11        65.    Defendants and their co-conspirators have combined, conspired and contracted to

12   adopt, implement and maintain late fees at supra-competitive levels.

13        66.    In the past, credit card issuers made most of their profits from interest and annual

14   fees. In the late 1980s, the major credit card issuers charged interest rates of 17%-20%. During this

15   time the major credit card issuers all charged an annual fee.

16        67.    In 1990, AT&T launched the Universal Card credit products, which had the feature of

17   no annual fees. This was followed in 1992 by Household Financial Services' (now HSBC) GM

18   Card with no annual fee and a 5% purchase earning credit toward the purchase of GM vehicles.

19   Faced with such competition, issuers gradually eliminated annual fees on standard non-reward cards

20   and introduced reward and affinity programs.

21        68.    Interest rates in general continued to decline in the early 1990s, due in part to

22   increased interest rate competition among the issuers. This, combined with the changes wrought by

23   new market entrants, resulted in historically low credit card interest rates. Between 1990 and 2004,

24   the average APR dropped from over 18% to just over 12%.

25        69.    Consequently, issuers' revenue from interest and annual fees as a percentage of total

26   revenue has fallen dramatically. While interest income accounted for about 75% of issuers' revenue

27   in 1991, it dropped to about 60% of issuers' revenue in 2003. The percentage of income that issuers

28   derive from annual fees has also declined precipitously.

COMPLAINT

70.     As those two big revenue streams shrank, issuers found other revenue sources by introducing and/or increasing "ancillary" sources of income.  Between 1996 and 2003, late fee revenues soared from $1.7 billion to $7.3 billion.  In 2005 the top six issuers reported assessing a total of $7.4 billion in late fees and over-limit fees, for an average of $1.2 billion each.

71.     Unlike annual fees, interest rates, and card attributes (*e.g.*, reward programs) where defendants competed and prices varied widely (and depending upon the issuer dropped over time) there has been little to no price competition with regard to late fees.  In fact, defendants have been able to set a price floor and impose price uniformity, as they ratchet up late fees and monitor to enforce this uniformity, over a period of years.

72.     Each defendant had a motive to conspire to impose and maintain supra-competitively priced late fees.  Because defendants have faced competition within the credit card industry on interest rates and annual fees charged to cardholders, defendants have increasingly relied on late fees as a source of income.  In contrast to over-limit fees, which are not charged on certain portfolios, including those aimed at affluent cardholders and frequent travelers, late fees are almost universally imposed across card portfolios and products.  Defendants knew, however, that late fees can also be subject to competition and price pressure because the industry saw that annual fees have been competed away almost entirely.  Accordingly, defendants had a strong incentive to restrain competition over imposition of the terms and pricing of late fees.

73.     Defendants began communicating with each other and their co-conspirators concerning the imposition, pricing, enforcement, marketing and collection of late fees through: (i) meetings facilitated by their membership and participation in industry trade shows and trade groups; (ii) meetings and symposia hosted by third-party processors; (iii) the networks, including board membership and participation in, among other activities, committees, subcommittees and advisory panels; (iv) use of common payment industry consultants; and/or (v) use of common third-party processors.  Indeed, all the major issuers have participated in numerous meetings sponsored by the networks, third-party processors, trade groups and/or consultants, that actually set aside time for peer-to-peer exchanges, *i.e.*, dedicated meetings of horizontal competitors that facilitated communication about the pricing and terms of late fees.

COMPLAINT

74. Defendants have ample opportunities to communicate among themselves about the pricing and terms of late fees, through trade organizations, consultants, the networks and third-party processors. During various meetings among the defendants facilitated by consultants, trade associations, third-party processors, and through membership on network boards, committees, subcommittees and advisory panels, defendants had the opportunity to and upon information and belief did explore the possibility of adopting uniform criteria for imposing and pricing late fees. The terms and prices of late fees ultimately implemented and agreed upon by defendants are materially identical. Defendants have increased late fees at or about the same time by about the same amounts, adopting methodologically identical or nearly identical terms. Any differences in the price and terms of late fees are immaterial to the ultimate purpose of the conspiracy: to impose late fees at identical or nearly identical prices and terms thus insuring a steady stream of revenues and high profit margins from these fees without the risk of competition breaking out as happened with annual fees and other price and non-price terms of credit cards.

75. By 1997, there was only slight variation in the terms and amount of late fees imposed by the defendant issuers. The defendants moved in lock-step as they increased the amount of late fees. By spring of 2001, nine of the top ten issuers charged a $29 late fee. By April 2004, the average late fee charged by the top ten issuers had risen to $36.50.

76. Defendant issuers also changed how and when late fees are assessed. In the early 1990s, most issuers would only assess a late fee if the account was more than 30 days past due. For example, in the mid-1990s, Citigroup charged a $15 late fee for every 15 days past the due date. Today, defendant issuers impose a late fee for being just one day past due. Grace periods have also shrunk, from 25-30 days to 10 days and even 1 day.

77. In 2001 and 2002, defendants Citigroup, Chase, Wells Fargo and Bank of America all introduced a virtually identical three-tier late fee billing structure, where the amount of the fee was determined by the cardholder's average balance. They did so through a third party processor system (defendants Citigroup, Chase and Wells Fargo employed FDR for processing their credit card portfolios in the 2001- 2002 timeframe, while Bank of America used TSYS). Processing companies usually add new billing features to their systems at the request of one or more of their bank clients.

COMPLAINT

1  By 2004, defendants Capital One (which uses TSYS), Washington Mutual (which used TSYS and

2  FDR) and HSBC (which used FDR) had implemented tiered late fees as well.

3       78.   In 2001, Citigroup boosted its late fees from $29 to $35 on past due balances over

4  $1000, $25 for balances between $100 and $1000, and $15 for balances under $100.   Soon

5  thereafter, MBNA implemented the same structure and late fees as Citigroup.

6       79.   At present, defendants, which together control over 70% of the U.S. credit card

7  market, charge similarly or identically tiered late fees.

8       The following table shows each defendant's current tiering structure:

| Current Late Fees Tiering by Issuer | | | |
|---|---|---|---|
| Issuer | Tier 1 | Tier 2 | Tier 3 |
| Bank of America * | $15 | $29 | $39 |
| MBNA * | $15 | $29 | $39 |
| Chase * | $15 | $29 | $39 |
| Citigroup * | $15 | $29 | $39 |
| HSBC ** | $19 | $29 | $39 |
| Wells Fargo ** | $20 | $29 | $35 |
| Capital One † | | $29 | $39 |
| Washington Mutual †† | $19 | - | $39 |

(*) Tier 1 applies to balances up to $100; Tier 2 applies to balances of $100 to $250; Tier 3 applies to balances over $250.

(**) HSBC and Wells Fargo tier 2 fee applies to balances between $100 and $1,000.

(†) Capital One uses a two-tier fee structure with $29 late fee charged on balances under $1,000, $39 fee on balances over $1,000.

(††) Washington Mutual uses a two-tier fee structure with $19 late fee charged on balances under $200, $39 fee on balances over $200.

25      80.   The tiered late fee billing structure used by defendants was facilitated and is

26  implemented by third-party processors FDR and TSYS, which, amongst other things, provide

27  cardholder accounting, billing calculation and statement mailing services.   Third-party card

28  processors introduce cardholder billing system changes at the specific request of one or more of their

COMPLAINT

1  bank clients.  In many cases, the requesting banks agree to pay the third-party processor fees for

2  system development and testing for new features.  The processing companies created the tiered late

3  fee billing structure and implemented it on their systems, then made the feature available to more

4  than one issuer to use to bill cardholders.  Third party processor FDR was used by defendants Chase,

5  Citibank and Wells Fargo, which all introduced the three-tiered late fee billing structure to

6  cardholders in 2001 and 2002.  During that same time period, Bank of America, used third party

7  processor TSYS to implement the same tiering structure.  By 2004, other defendants using those

8  same two processors – HSBC (using FDR) and Washington Mutual (both TSYS and FDR) – had

9  implemented tiered fee billing structures as well.  Use of common third-party processors allowed

10  defendants to stay apprised of, receive and share information about one another's late fee pricing

11  structures.

12  　　　　81.　　The payment industry purports to be "competitive" in the issuance of credit cards.

13  Solicitations directed by defendants to cardholders tout low interest rates for balance transfers, cash

14  advances, no annual fees and all manner of perks (frequent flyer miles, cash back and points toward

15  merchandise).  However, the advertising and promotions that the defendant issuers use to attract

16  customers demonstrate that while defendants may compete on these terms, they do not compete with

17  regard to late fees.  Defendants compete on the pricing front end (annual fees, APRs, rebates,

18  rewards, etc.), but not on late fees.

19  　　　　82.　　While issuers have significantly slashed interest rates and annual fees since 1992,

20  they have not rolled back late fees or liberalized their late fee terms and policies.  In fact, late fees

21  have risen dramatically since 1992.  In sum, the defendants have set and maintained a price floor for

22  late fees which has steadily been ratcheted up as one or more of the defendants imposes an increase

23  with the others following close behind.  Defendants have maintained this disciplined price

24  maintenance over a number of years.  As the following table illustrates, late fees have climbed

25  between 2001 and 2006, unabated by competition among defendant issuers in an otherwise

26  purportedly competitive issuing market:

27

28

COMPLAINT

**Late Fees by Issuer**

| Issuer | 2001 | 2006 |
|---|---|---|
| Citigroup | $35 | $39 |
| MBNA | $29 | $39 |
| Chase | $29 | $39 |
| Capital One | $29 | $39 |
| B of A | $29 | $39 |
| HSBC | $29 | $39 |
| Washington Mutual/Providian | $29 | $39 |
| Wells Fargo | $29 | $35 |

83.    The conspiracy to fix and maintain the terms and prices of late fees was facilitated by the unfair manner in which the fees were imposed and are maintained. While defendants conspired to impose the late fees and not compete on pricing and terms, plaintiff and other members of the classes did not affirmatively agree to accept them. Changes to late fees were either engrafted onto existing cardholder agreements through change in terms notices or buried in the cardholder agreements.

84.    Defendants also presented late fees, as well as over-limit fees, as enforceable terms in their cardholder agreements and change-in-terms letters. Defendants know that the pricing of late fees and over-limit fees bears no relationship to any actual damages sustained as a result of late payment or exceeding prescribed credit limits, and that the pricing exceeded permissible amounts under the NBA interpreted consistent with constitutional limits on punitive damages set by *State Farm*. However, defendants continue to represent to cardholders that the terms and conditions of late fees and over-limit fees were legal and enforceable.

85.    To the extent written information concerning late fees and over-limit fees, including their purported enforceability, is presented to cardholders in agreements and changes of term notices, it is done at a level too difficult for even a college educated consumer to understand, which facilitated defendants' conspiracy to fix and maintain the prices of late fees. In addition, design features such as text placement and font sizes do not conform to guidelines for creating easily readable documents. Contrary to usability and readability best practices, defendants conceal important information in text, fail to group and label related material, and use small typefaces.

COMPLAINT

1   Edward Yingling, president of the American Bankers Association – which counts among its most

2   influential members defendants Citigroup and Chase and MBNA – admitted cardholders have

3   difficulty understanding fee forms and contracts. When asked during a 2004 interview whether he

4   understands the contract sent to him with his credit card, he stated, "I think it would be very hard for

5   a lot of people to understand." In response to the GAO 2006 report, Yingling also admitted that with

6   regard to issuers' delivery of information to consumers: "The disclosure system is not working well.

7   It needs to be fixed." The GAO report recommended changes in disclosures to emphasize penalties.

8   The GAO report is based on, *inter alia*, the practices of defendants Citigroup, Chase, Bank of

9   America, Capital One and interviews with 112 cardholders.

10  **Effect of the Conspiracy**

11      86.     The purpose and effect of defendants' unlawful concerted conduct and conspiracy is

12  to inhibit competition and harm consumers, and benefit themselves, by fixing and maintaining late

13  fees at supra-competitive levels, which would not be imposed at such levels in the absence of

14  concerted activity. The conspiracy also deprives plaintiff and other members of the classes of any

15  meaningful choice concerning late fees and severely limits their ability to obtain a credit card that

16  does not contain late fees priced at supra-competitive levels.

17      87.     Without their knowledge or consent, consumers subject to the collusively set and

18  implemented late fees suffer increased costs of using their credit cards. In addition to being set and

19  maintained at supra-competitive levels, late fees frequently cause consumers to incur additional fees,

20  such as over-limit fees and higher interest rates as they are simply lumped into a cardholder's unpaid

21  balance. In addition, late fees impair the ability of cardholders to reduce their overall indebtedness.

22  Generally, any penalty charges that cardholders pay would consume funds that could have been used

23  to repay principal.

24      88.     Absent the conspiracy, most, if not all, of the defendants would not have imposed

25  materially identical late fees, but instead would have competed over the conditions, terms and

26  pricing of late fees given that the costs of late payment are *de minimus* and are more than recovered

27  through interest charges and other fees. In a competitive market, the price of late fees would have

28  been greatly reduced and certain defendants would simply not have imposed them.

COMPLAINT

## THE ARBITRATION CLAUSES FORCED ON THE
## PLAINTIFF IS NOT ENFORCEABLE

89.     Defendants have attempted to insulate their illegal and unfair business practices from legal liability.  Each of the defendants include onerous, one-sided arbitration clauses in their cardholder agreements.  Among other reasons, they are unenforceable because they require cardholders to forego the right to participate in a class action and/or class-wide arbitration.  This attempted class action ban, inserted by parties of vastly superior bargaining power and resources into a form contract of adhesion, is procedurally and substantively unconscionable.  Collective action is the only practical means for cardholders, who have been injured in relatively small monetary amounts, to obtain redress of their grievances.  In addition, the arbitration clauses prevent plaintiff from vindicating important statutory rights.  Another egregious provision, which must preclude enforcement, is the near universal designation of NAF as an arbitration administrator by defendants.  It is the exclusive arbitration administrator of MBNA, and it is also designated as an arbitration administrator for Capital One, Chase, Citigroup, Household, and Providian.  NAF's activities are funded primarily through credit card arbitrations.  NAF's record on arbitration reveals an extreme tendency to favor defendants.  A third reason precluding enforcement is the deprivation of an appeal from the arbitrator's ruling.  Rather, the cardholder agreements require that all factual and legal issues be considered "anew" by a second arbitration panel.  Requiring the factual and legal issues to be tried "anew" before different arbitrators deprives plaintiff of a fair and adequate mechanism for the vindication of plaintiff's rights because plaintiff would face the identical risk, and prohibitive costs, in the new proceeding instead of merely having the record reviewed by the appellate court.

### FRAUDULENT CONCEALMENT

90.     Throughout the conspiracy, defendants and their co-conspirators affirmatively, actively and intentionally concealed the unlawful conduct alleged herein from plaintiff and the classes. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their high-level executives. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid

COMPLAINT

1    detection.   Plaintiff did not discover, and could not have discovered through the exercise of

2    reasonable diligence, that defendants and their co-conspirators were violating the antitrust laws as

3    alleged herein until shortly before this class action was commenced.

4         91.    As a result of the active concealment of the conspiracy by defendants and their co-

5    conspirators, any and all applicable statutes of limitation otherwise applicable to the allegations

6    herein have been tolled.  Plaintiff reserves the right to amend her allegations, including the Class

7    Period, once the origins of the conspiracy, including the approximate date of its inception, are

8    brought to light.

9                                  **COUNT I**

10        **For Charging Excessive Late Fees in Violation of the National Bank Act**
                            **(12 U.S.C. §§85-86)**

11
12        92.    Plaintiff realleges and incorporates by reference the allegations set forth above on

13    behalf of herself, the Nationwide Injunctive Relief Class and the Nationwide Late Fee Damages

      Class.
14
          93.    Defendants charge late fees in excess of what is authorized by the NBA.  The NBA
15
      authorizes the assessment of late fees in accord with the law of the state in which the issuer is
16
      chartered.  These late fees are punitive damages imposed on cardholders for breaches of contractual
17
      obligations.  Under principles of constitutional avoidance, the NBA must be interpreted to be
18
      consistent with constitutional strictures.   Therefore, it must be interpreted to authorize only the
19
      assessment of those punitive damages that comport with substantive due process.  Further, the NBA,
20
      properly interpreted, can only permit the exportation of those state statutes whose authorization of
21
      punitive late fees incorporates substantive due process limits.
22
          94.    The exorbitant amount of late fees charged by defendants render them punitive
23
      damages that are excessively disproportionate to any losses suffered by defendants by a factor that
24
      exceeds nine times the defendants' losses.  They are, therefore, inconsistent with the substantive due
25
      process limits recognized by the United States Supreme Court in *State Farm*, 538 U.S. 408.  Because
26
      the NBA must be interpreted to be consistent with constitutional limitations, it cannot authorize these
27

28

COMPLAINT
                                                                              - 25 -

1  unconstitutionally excessive punitive damages as legally enforceable.  Therefore, these late fees are

2  assessed outside the authority granted by the NBA in violations of 12 U.S.C. §§85 and 86.

3      95.     Defendants knowingly imposed punitive late fees for breaches of contract that

4  exponentially exceeded any damages actually incurred.  As a result, defendants knowingly imposed

5  late fees that are greater than what is allowed by §85 of the NBA.

6      96.     Accordingly, plaintiff and members of the classes named in this Count are entitled to

7  bring this claim and to recover herein restitutionary disgorgement, compensatory damages, punitive

8  and/or special damages, reasonable attorneys' fees, costs, and other injunctive and declaratory relief

9  as may be available, including the recovery of two times the amount of late fees charged during the

10  statutory period.

**COUNT II**

**For Charging Excessive Over-limit Fees in Violation of the National Bank Act**
**(12 U.S.C. §§85-86)**

11

12

13

14      97.     Plaintiff realleges and incorporates by reference the allegations set forth above on

15  behalf of herself, the Nationwide Injunctive Relief Class and the Nationwide Over-Limit Fee

Damages Class.

16

17      98.     Defendants charge over-limit fees in excess of what is authorized by the NBA.  The

18  NBA authorizes the assessment of over-limit fees in accord with the law of the state in which the

issuer is chartered.  These over-limit fees are punitive damages imposed on cardholders for breach of

19  contractual obligations.  But the NBA must be interpreted to be consistent with constitutional

20  strictures.  Therefore, it must be interpreted to authorize only the assessment of those punitive

21  damages that comport with substantive due process limitations.  Further, the NBA, properly

22  interpreted, can only permit the exportation of those state statutes whose authorization of punitive

23  over-limit fees incorporates substantive due process limits.

24      99.     The exorbitant size of over-limit fees charged by defendants render them punitive

25  damages that are excessively disproportionate to any losses suffered by defendants by a factor that

26  exceeds nine times the defendants' losses.  They are, therefore, inconsistent with the substantive due

27  process limits recognized by the United States Supreme Court in *State Farm*, 538 U.S. 408.  Because

28

COMPLAINT

1   the NBA must be interpreted to be consistent with constitutional limitations, it cannot authorize these

2   unconstitutionally excessive punitive damages as legally enforceable.   Therefore, these over-limit

3   fees are assessed outside the authority granted by the NBA in violations of 12 U.S.C. §§85 and 86.

4        100.   Defendants knowingly imposed over-limit fees for breaches of contract that

5   exponentially exceed any damages actually incurred.   As a result, defendants knowingly imposed

6   over-limit fees that are greater than what is allowed by the §85 of the NBA.

7        101.   Accordingly, plaintiff and members of the classes named in this Count are entitled to

8   bring this claim and to recover herein restitutionary disgorgement, compensatory damages, punitive

9   and/or special damages, reasonable attorneys' fees, costs, and other injunctive and declaratory relief

10   as may be available, including the recovery of two times the amount of over-limit fees charged

11   during the statutory period.

### COUNT III

**Violation of the Sherman Act (15 U.S.C. §1)**
**Per Se Unlawful and Unreasonable Restraint in Trade**

102.   Plaintiff realleges and incorporates by reference the allegations set forth above on

behalf of herself, the Nationwide Injunctive Relief Class and Nationwide Late Fee Damages Class.

103.   Defendants and their co-conspirators have continually engaged in an unlawful

contract, combination and conspiracy in unreasonable restraint of trade and commerce in violation of

§1 of the Sherman Act, 15 U.S.C. §1.

104.   The combination and conspiracy has consisted of a continuing agreement,

understanding and concert of action among the defendants, the substantial terms of which have been

to limit competition over the imposition, terms and pricing of late fees imposed on cardholders who

use defendants' credit card products.

105.   Defendants placed their credit card products into the stream of commerce with

knowledge that consumers would incur and pay late fees.

106.   At all times, the defendants had market power in the credit card market sufficient to

force plaintiff and the class members named in this Count to accept cards with excessive and illegal

late fees and to set late fees at supra-competitive levels.

COMPLAINT

107.    The ability of plaintiff and the classes to obtain credit cards without late fees or which are set through competition unfettered by collusion, was and is effectively reduced, limited and foreclosed.

108.    Defendants' combination and conspiracy has had and/or is likely to have the following effects, among others:

(a)    Actual and potential competition in the credit card market with respect to the imposition, terms and pricing of late fees has been limited, reduced, restrained, suppressed and effectively foreclosed;

(b)    Late fees have been set at supra-competitive and disproportionate levels, in excess of what could constitutionally be authorized by the NBA and other statutes;

(c)    Members of the classes have paid late fees set at supra-competitive and disproportionate levels, in excess of what could constitutionally be authorized by the NBA and other statutes; and

(d)    Defendants have derived direct and substantial economic benefit from their anticompetitive conduct.

109.    As a remedy for defendants' and conspirators' violations of §1 of the Sherman Act, plaintiff and members of the classes have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars prior to trebling.

110.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.

## COUNT IV

### Violation of Business & Professions Code §17200, *et seq.*

111.    Plaintiff realleges and incorporates by reference allegations set forth above on behalf of herself, the California Late Fee Class and the California Over-limit Fee Class.

112.    Defendants' imposition and pricing of Penalty Fees constitutes unlawful business practices under the UCL because they violate the common law of contracts that prohibits imposing punitive damages for breaches of contract. The NBA cannot be invoked to defend the imposition of

COMPLAINT

1   punitive Penalty Fees without limit, because the NBA and regulations promulgated thereunder must

2   be interpreted to allow only punitive damages that comport with the substantive due process

3   requirements articulated in *State Farm*. Defendants' Penalty Fees vastly exceed nine times their

4   actual damages and thus violate the NBA and regulations as constitutionally interpreted. Nor can

5   Cal. Fin. Code §4001 be invoked to defend defendants' practice. Defendants' fees both vastly

6   exceed what this provision authorizes on its face and what this provision actually authorizes, once

7   interpreted to comport with the substantive due process requirements articulated in *State Farm*. In

8   addition, defendants' imposition of excessive Penalty Fees are unlawful business practices under the

9   UCL because they violate the Sherman Act, the Cartwright Act, and the CLRA.

10      113.   Defendants' imposition and pricing of Penalty Fees also constitutes deceptive

11  business practices under the UCL because they are likely to mislead consumers into believing they

12  are legally obligated to pay the level of Penalty Fees defendants impose when in fact punitive

13  Penalty Fees that exceed nine times defendants' actual damages are legally unenforceable.

14  Defendants conceal from cardholders the amount of actual damages they suffer from late payment

15  and over limit charges.   Thus, cardholders have no way of knowing the maximum amount of

16  penalties they are obligated to pay for breaching their contract with defendants by paying late or

17  making charges that exceed their credit limit. Defendants mischaracterized the Penalty Fees as "late

18  fees" or "over-limit fees" instead of punitive penalties. Defendants knew or should have known that

19  consumers would believe the Penalty Fees were legal and would pay them without questioning their

20  punitive nature, legality or enforceability.

21      114.   The acts, omissions, misrepresentations, practices and non-disclosures of defendants

22  as alleged also constitute unfair business practices because the imposition of Penalty Fees offends

23  the established public policies of prohibiting punitive damages for breaches of contract and

24  attempting to invoke unconstitutional interpretations of federal and state statutes and regulations.

25  Defendants' practices of imposing excessive Penalty Fees are also immoral, unethical, oppressive,

26  unscrupulous and substantially injurious to consumers.   The gravity of the harm defendants'

27  practices cause far outweighs the utility of the imposition of excessive late fees.

28

COMPLAINT

1    115.   Plaintiff and all members of the proposed classes have suffered the loss of money as a

2    result of defendants' unlawful, deceptive and unfair business practices.

3    116.   As a result of defendants' violations of the UCL, plaintiff and members of the classes

4    named in this Count are entitled to bring this claim and to recover restitution, reasonable attorneys'

5    fees, and costs and other injunctive or declaratory relief as may be available.

6                                      **COUNT V**

7                **Violation of the California Consumers Legal Remedies Act**

8    117.   Plaintiff realleges and incorporates by reference the allegations set forth above on

9    behalf of herself, the California Late Fee Class and the California Over-limit Fee Class.

10   118.   The California Consumers Legal Remedies Act, Civil Code §1750, *et seq.* ("CLRA")

11   has adopted a statutory scheme prohibiting various deceptive practices in connection with the

12   conduct of a business providing goods, property or services primarily for personal, family or

13   household purposes.

14   119.   The policies, acts and practices engaged in by defendants and alleged in this

15   Complaint were intended to, and did, result in the payment of unconstitutionally disproportionate

16   Penalty Fees by members of the classes, and violated and/or continue to violate the CLRA in at least

17   the following respects:

18           (a)    Section 1770(a)(5) – representing that goods or services have sponsorship,

19   approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a

20   person has a sponsorship, approval, status, affiliation or connection that he or she does not have;

21           (b)    Section 1770(a)(7) – representing that goods or services are of a particular

22   standard, quality or grade if they are of another;

23           (c)    Section 1770(a)(9) – advertising goods or services with intent not to sell them

24   as advertised;

25           (d)    Section 1770(a)(14) – representing that a transaction confers or involves

26   rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and

27           (e)    Section 1770(a)(19) – inserting an unconscionable provision in the contract.

28

COMPLAINT

- 30 -

1    120.    Plaintiff and members of the classes have suffered irreparable harm, entitling them to

2  both injunctive relief and restitution.

3    121.    In compliance with the provisions of Civil Code §1782, plaintiff has given written

4  notice to defendants of her intention to file an amended complaint without leave of Court for

5  damages under Civil Code §1750, *et seq.* if defendants fail to offer appropriate consideration or other

6  remedy to all affected consumers as described in the written notice within 30 days of such written

7  notice.

8    122.    Plaintiff and members of the classes are entitled to, pursuant to Civil Code

9  §1780(a)(2), an order enjoining the defendants' above-described wrongful acts and practices,

10  providing restitution to plaintiff and members of the classes, and ordering the payment of costs and

11  attorneys' fees and any other relief deemed appropriate and proper by the Court under Civil Code

12  §1780.

13                              **COUNT VI**

14                    **Violation of the Cartwright Act**

15    123.    Plaintiff realleges and incorporates by reference the allegations set forth above on

16  behalf of herself and the California Late Fee Class.

17    124.    The agreements and practices described herein are prohibited by California's

18  Cartwright Act, Cal. Bus. & Prof. Code §§16700 and 16720, *et seq.*, because they constitute

19  combinations, contracts and conspiracies with the purpose and effect of restraining or restricting

20  trade and commerce, preventing or suppressing competition over the terms and pricing of late fees

21  and maintaining and increasing the price of late fees. The agreements and practices described herein

22  violated these statutes.

23    125.    As a result of these undisclosed agreements, plaintiff and members of the class named

24  in this Count paid late fees in amounts and prices in excess of what they would have paid in a

25  competitive market, and sustained further damages due to the lack of competition over the terms of

26  late fees. As a result of defendants' violations of the Cartwright Act, plaintiff and the California

27  Late Fee Class are entitled to bring this claim and to recover herein damages, which are subject to

28

COMPLAINT

1    trebling according to law, reasonable attorneys' fees, and costs and other injunctive or declaratory

2    relief as may be available.

### COUNT VII

**Breach of Covenant of Good Faith and Fair Dealing**

5    126.    Plaintiff realleges and incorporates by reference allegations set forth above on behalf

6    of herself, the California Late Fee Class and the California Over-limit Fee Class.

7    127.    The requirement of "good faith" reflects on the principle of fair and open dealing with

8    consumers. It does not simply mean that terms must not be used deceitfully; it means that terms

9    should be drafted in a way that respects consumers' legitimate interests. The test of fairness involves

10   not only how a term is used, but how it could be used. In addition, the test of fairness also takes

11   account of the circumstances surrounding the conclusion of the contract and the effect of the other

12   terms in the contract. The contracts between defendants and each class member are simply a

13   covenant of good faith and fair dealing. By imposing excessive late fees and over-limit fees in

14   violation of the law, defendants uniformly breached this covenant of good faith and fair dealing.

15   128.    Contract law prohibits defendants from imposing punitive damages for breaches of

16   the standardized credit card agreements, such as late payments and incurring charges over a

17   consumer's credit limit. Penalty Fees imposed for such breaches are a form of punitive damages.

18   Until 2003, defendants believed that state and federal statutes and regulations allowed them to

19   bypass longstanding contract law and impose whatever level of punitive damages they chose when

20   cardholders made late payments or incurred charges over their credit limit. In 2003, however, the

21   Supreme Court held that the United States Constitution, under the Due Process Clause, prohibits

22   punitive damages that exceed nine times actual damages. The statutes and regulations allowing

23   punitive damages for late payments and over the limit fees must be interpreted to comport with these

24   Due Process requirements. Accordingly, defendants charge late fees and over-limit fees that exceed

25   what the statutes and regulations allow.

26

27

28

COMPLAINT

1                              **COUNT VIII**

2              **Unjust Enrichment/Restitution/Constructive Trust**

3          129.   Plaintiff realleges and incorporates by reference the allegations set forth above on

4    behalf of herself, the California Late Fee Class and the California Over-limit Fee Class.

5          130.   This Count is alleged against all defendants.  Defendants have benefited from their

6    unlawful and inequitable acts alleged in this Complaint.  Defendants' financial benefits resulting

7    from their unlawful and inequitable conduct are traceable to payments of unlawful Penalty Fees

8    resulting from defendants' exceeding the bounds of the NBA that transgress substantive due process

9    limits on punitive damages, defendants' deceptive and unfair practices described herein and

10   defendants' unlawful combination and conspiracy to restrain trade in the setting and maintenance of

11   credit card Penalty Fees.

12         131.   The classes have conferred upon defendants an economic benefit, in the nature of

13   profits resulting from unlawful Penalty Fees, to the economic detriment of plaintiff and the members

14   of the classes.

15         132.   The economic benefit of Penalty Fees and unlawful profits derived by defendants

16   through charging penalties in excess of what is authorized by the NBA for exceeding their credit

17   limit or for making a late payment of credit card bills is a direct and proximate result of defendants'

18   unlawful practices.

19         133.   The financial benefits derived by defendants by reason of their unlawful conduct

20   rightfully belong to plaintiff and the classes, as they have paid unlawful Penalty Fees during the

21   Class Period, inuring to the benefit of defendants.

22         134.   It would be inequitable for the defendants to be permitted to retain any of the Penalty

23   Fees derived from defendants' unfair and unconscionable methods, acts and trade practices alleged

24   in this Complaint.

25         135.   Defendants should be compelled to disgorge into a common fund for the benefit of

26   plaintiff and the classes all unlawful or inequitable proceeds received by them through the

27   imposition of Penalty Fees.  A constructive trust should be imposed upon all sums unlawfully or

28

COMPLAINT

1  inequitably received by defendants traceable to plaintiff and the classes from which plaintiff and the

2  other class members may make claims for restitution.

3                                    **PRAYER FOR RELIEF**

4         WHEREFORE, plaintiff prays

5         A.     That the Court declare, adjudge and decree that defendants have committed the

6  violations of federal and state law alleged herein;

7         B.     That the Court enter an order pursuant to Rule 23 of the Federal Rules of Civil

8  Procedure permitting this action to be maintained as a class action on behalf of the classes specified

9  herein and that plaintiff's counsel be appointed class counsel pursuant to Rule 23(g);

10        C.     That the defendants, their directors, officers, employees, agents and successors be

11  enjoined and restrained from, in any manner, directly or indirectly, the continuing the illegal course

12  of conduct alleged herein;

13        D.     That the Court order defendants to return to the cardholders twice the amount of late

14  fees and over-limit fees charged for the statutory period defined in the NBA;

15        E.     That the Court award damages, sustained by the plaintiff and members of the classes

16  as a result of violation of the Sherman Act, 15 U.S.C. §1, *et seq.* and the Cartwright Act, an amount

17  to be proved at trial, to be trebled according to law, plus interest, attorneys' fees and costs of suit;

18        F.     That the Court order disgorgement of defendants' ill-gotten gains and/or impose a

19  constructive trust upon all such ill-gotten gains and award plaintiff and class members full restitution

20  of all monies wrongfully required by defendants;

21        G.     That plaintiff and other members of the classes be granted such other, further and

22  different relief that is necessary to prevent a recurrence of the conspiracy; and

23        H.     That the Court award plaintiff their attorneys' fees, costs and prejudgment interest

24  and such other and further relief as this Court may deem just and proper.

25

26

27

28

COMPLAINT

**JURY DEMAND**

Plaintiff demands a trial by jury of issues properly triable thereby.

Dated:  February 6, 2007

Respectfully submitted,

SCOTT + SCOTT, LLP
Arthur L. Shingler III
600 B Street, Suite 1500
San Diego, CA  92101
Telephone:  (619) 233-4565
Facsimile:  (610) 233-0508

SCOTT + SCOTT, LLP
David R. Scott
108 Norwich Avenue
P. O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432

*Counsel for Plaintiff*

COMPLAINT

- 35 -

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

ATTORNEY OF RECORD FOR PLAINTIFF